# GEORGIA POWER COMPANY

v.

# The UNITED STATES.

## No. 538–77.

United States Court of Claims.

July 16, 1980.

Robert L. Pennington, Atlanta, Ga., for plaintiff; Richard G. Holloway, Herbert D.

---

Shellhouse, and Troutman, Sanders, Lockerman & Ashmore, Atlanta, Ga., of counsel.

Eric S. Gould, Washington, D. C., with whom was Asst. Atty. Gen. James W. Moorman, Washington, D. C., for defendant.

Before NICHOLS, KASHIWA and SMITH, Judges.

## ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

KASHIWA, Judge:

This is a taking claim against the United States, before us on the parties' cross motions for summary judgment. Georgia Power Company (plaintiff) claims a taking of its electrical powerline easement which, allegedly, is vested 25 feet above full pool elevation of the Clark Hill Reservoir.[1] The act complained of is defendant's failure to regulate mast and antenna heights of recreational sailboats used on the reservoir by the public.

Sometime shortly after 1977 plaintiff raised the powerline at issue to 54 feet above the reservoir's full pool elevation and now seeks to recover from the United States its costs expended therefor.[2] The United States never ordered plaintiff to raise its powerline. Plaintiff did so after a near accident in 1971 and a fatal accident in 1973 in which a passenger in a sailboat was killed when the mast of the sailboat struck plaintiff's powerline. Pursuant to a "hold harmless" provision in plaintiff's easement agreement executed with the United States on December 7, 1951, the Government was not financially liable for the damages resulting from the fatal 1973 accident.[3] In addition, a report by defendant disclosed that, as of May 1975, 47 percent of the sailboats permanently moored on the reservoir had masts in excess of 25 feet (with the number predicted to increase).

Plaintiff requested defendant pay for the raising of the powerline. Defendant, acting through the Corps of Engineers, refused, claiming, *inter alia*, insufficient justification. According to Brigadier General Drake Wilson, Deputy Director of Civil Works:

> * * * For the most part, the nonconforming crossings are located in coves and not in the main channels used by the sailboats. Other crossings are located in areas where the practical recreational use of a sailboat is limited by bridges and certain natural constraints.

Prior to the construction of the reservoir, plaintiff was in possession of powerline easements on its Toccoa–Augusta powerline, portions of which traversed land which was subsequently flooded. Negotiations between plaintiff and defendant began in 1945 regarding the status of this Toccoa–Augusta powerline. Rather than condemning the portions of the powerline easements soon to be flooded, by agreement dated February 26, 1951, plaintiff and the United States negotiated a removal and relocation

---

1. This project involving the Savannah River Basin in Georgia and South Carolina was authorized by Congress on December 22, 1944, by Pub.L. No. 78–534. A Definite Project Report was approved on February 20, 1946, which stated the project was constructed for "hydroelectric power, improvement of navigation, and other purposes." Recreational boating on the reservoir is not an inconsistent use. The project was planned and is administered by the Army Corps of Engineers. 36 C.F.R. § 327 *et seq.*

2. The present phase of litigation deals solely with the issue of liability. By agreement of the parties, the issue of the amount of damages is not before the court.

3. Condition 7 of the easement agreement provides:

   "That the United States shall not be responsible for damages to property or injuries to persons which may arise from or be incident to the use and occupation of the said premises, nor for damages to the property of the grantee, or for injuries to the person of the grantee (if an individual), nor for damages to the property or for injuries to the person of the grantee's officers, agents, servants, or employees, or others who may be on said premises at their invitation or the invitation of any one of them, arising from or incident to governmental activities, and the grantee shall hold the United States harmless from any and all such claims * * *."
   *See* Condition 8, *infra.*

of the powerlines, at the expense of the United States (totaling $232,800). Pursuant to this agreement, on December 7, 1951, plaintiff was given an "easement or right of way" traversing portions of the Clark Hill Dam and Reservoir Project, which was to be "equivalent to the right surrendered by [plaintiff] on the land from which the facilities are removed * * *."[4] Thereupon, plaintiff constructed the powerline at a height of 25 feet above the reservoir's full pool.

Plaintiff argues it possessed a vested property interest in a powerline easement at 25 feet above full pool elevation. Additionally, plaintiff claims defendant's non-regulation of the height of masts and antennae is a type of "affirmative regulation" constituting permission to use the reservoir by boats which cannot negotiate under the powerline. After consideration of the briefs and oral argument, we hold for defendant and find no taking by the United States.

Even assuming plaintiff did have a vested property interest in a powerline easement at 25 feet above full pool elevation (which we find unnecessary to decide), there was no taking upon which the plaintiff may recover because the interference complained of constituted acts of independent third parties. As such, there is no Fifth Amendment liability on the part of the United States, a rule of law earlier held in a case analogous to the controversy at hand. *Minot v. United States*, 212 Ct.Cl. 154, 546 F.2d 378 (1976). *See also United States v. General Motors Corp.*, 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311 (1945).

In *Minot* the United States had a 34–kilovolt electrical powerline easement over the plaintiff's property. The United States entered into a powerline pooling agreement with the Guam Power Authority (GPA), a public corporation of the Government of Guam, possessing the power of eminent domain and the power to sue and be sued in its own name. This pooling agreement allowed GPA to use the easement possessed by the United States. Subsequently, and without authorization, GPA erected a 115–kilovolt powerline involving, for example, much larger support towers on plaintiff's property. Plaintiff argued GPA's action amounted to a taking by the United States. The court denied plaintiff's taking claim because (1) the permit issued to GPA by the United States "did not authorize GPA to do anything that the Government had not the common law right to allow it to do," and (2) any "condemnation" of plaintiff's land by GPA's action was the result of independent local action for which the United States was not liable. 212 Ct.Cl. at 159, 546 F.2d at 381. Similarly in the instant case, the facts do not reveal any interference by the United States. It was the public boaters—independent third parties—who interfered with plaintiff's use of the powerline.[5]

At the time the negotiations to relocate plaintiff's powerline were taking place (in the early 1950's), it was unanticipated by either party that boats with masts tall enough to come in contact with the powerline would ever be used on the reservoir. Also, from the time of these negotiations to the time of the accident, the same regulation containing no restriction on the height of either masts or antennae was in force. In short, there has never been any regulation by the Government of the size of either mast or antenna heights allowed on the reservoir. Although plaintiff argues defendant fixed the height of the powerline at

---

4. No reference to the height of the powerline was contained in this easement or any of the easements surrendered.

5. There was only one act of direct interference with plaintiff's powerline (the fatal accident), plus the large percentage of "nonconforming" sailboats. On its face, this one accident plus the near accident is only an "intermittent interference," and we do not hold that plaintiff has proven a recurrence was inevitable–constitut-

ing a sufficient appropriation for a taking. *See Wilfong v. United States*, 202 Ct.Cl. 616, 622, 480 F.2d 1326, 1329 (1973). *Accord, North Counties Hydro–Electric Co. v. United States*, 138 Ct.Cl. 380, 382–383, 151 F.Supp. 322, 323, *cert. denied*, 355 U.S. 882, 78 S.Ct. 149, 2 L.Ed.2d 112 (1957); *National By–Products, Inc. v. United States*, 186 Ct.Cl. 546, 576–577, 405 F.2d 1256, 1273 (1969).

25 feet, we feel the facts more properly establish that defendant only required a minimum height of 25 feet above full pool elevation.[6] Defendant asserts before us that the 25–foot clearance was consistent with the then existing standards of the National Electric Safety Code. Further, it is clear from the December 7, 1951, easement agreement that the risk of the powerline becoming dangerous was allocated solely to plaintiff. Condition 8 of the easement agreement provides:

> That the United States shall not be responsible for damages to property or injuries to person which may arise from or be incident to the construction, maintenance, and use of said line.

Condition 4 of the easement agreement provides:

> That the grantee shall supervise the said line and cause it to be inspected at reasonable intervals, and shall immediately repair any defects found therein as a result of such inspection, or when requested by said officer to repair any defects. Upon completion of the installation of said line and the making of any repairs thereto, the premises shall be restored immediately by the grantee, at the grantee's own expense, to the same condition as that in which they existed prior to the commencement of such work, to the satisfaction of the said officer.

Also, we find Condition 3, which is reprinted in the margin,[7] placed plaintiff on notice that it would not be indemnified for any modifications necessary in, e. g., the interest of public safety. *See also* Condition 7, *supra* at note 3. A change in the status quo of the boats using the reservoir, rendering the use of the powerline dangerous, falls within the provision of the above–quoted Conditions.

■ Additionally, although plaintiff asserts quite vigorously that defendant should have issued regulations proscribing the use of the reservoir by boats with mast or antenna heights tall enough to come in contact with the powerline, plaintiff has not proven this was an affirmative duty imposed on the defendant. To the contrary, we feel the issuance of such regulations is merely a discretionary act, and a taking may not result from this discretionary inaction. Indeed, after the near accident in 1971, defendant did post buoys and signs and mark navigational maps to warn of the potential hazard.[8] Hence, reasonable actions were taken by the Corps of Engineers to warn the public of the potential hazard. Thus, while it is true the Government could have done more, it did take reasonable actions to discharge its responsibility to protect the safety of the boating public. Referring back to the analysis of Brigadier General Drake Wilson, the powerline did not cross at main channels but, rather, in areas where sailboating is limited by natural or artificial constraints. Unfortunately, the Corps' actions did not guarantee there would be no accidents, but we cannot hold the defendant's assessment of, and reaction to, the safety problem was improper under the circumstances. Neither can we agree with plaintiff's assertion that the "[d]efendant knowingly abdicated its responsibility to assure public safety, forcing the plaintiff to assume this duty by default." It was not assumed by default. The United States and plaintiff allocated the obligation to maintain the safe operation of the power-

---

6. We do acknowledge that since defendant was paying for the powerline to be relocated it would attempt to keep the costs low, thereby seeking a lower relocation height than plaintiff might possibly have desired. However, at best, that would merely have been a conflicting negotiating position. Nothing presented to us indicates defendant possessed unusual leverage to force plaintiff to assent to a maximum height of 25 feet against its will.

7. Condition 3 of the easement agreement provides:

"That the use and occupation of said land incident to the exercise of the privileges hereby granted shall be subject to such rules and regulations regarding ingress, egress, safety, sanitation, and security as the District Engineer, Savannah District, may from time to time prescribe."

8. No evidence has been produced that such buoys, signs, and other warnings were not properly maintained.

line to the plaintiff. Also, after placing the warnings of the potential danger presented by the powerline, it thereupon became the obligation of the operators of the vessels to abide by such warnings–any disregard thereof, either intentionally or negligently, is not an act authorized by the United States.

Plaintiff maintains its powerline was "safe" within the meaning intended by the Conditions to which the easement is subject, averring what is unsafe is boating underneath the powerline, an act "specifically authorized" by defendant. We disagree. Plaintiff's interpretation of the above–mentioned Conditions is too narrow and, as stated above, any boater ignoring the posted warnings is not acting under authority of the United States. Thus, since the Government never altered the regulatory scheme, we agree with defendant: Plaintiff is in effect basing its claim on the ground that the United States did not alter the status quo for the benefit of plaintiff, and lacking such regulation, plaintiff now seeks indemnification from the United States due to the occurrence of an event the risk of which occurrence plaintiff assumed. However, the United States never ordered plaintiff to relocate its powerline; the United States is under no affirmative duty to prohibit the use of this reservoir by boats with masts or antennae that are too tall to negotiate under the powerline; and plaintiff assumed the obligation of the continued safe operation of the powerline. Accordingly, under the circumstances here present, defendant's nonregulation of mast and antenna heights does not amount to an authorized interference with plaintiff's powerline, and no taking may be found. Plaintiff's claim really appears to be grounded on a contractual dispute regarding its obligation assumed under the December 7, 1951, easement agreement. As we have held before, contractual disputes seldom give rise to a taking. *J.J. Henry Co. v. United States*, 188 Ct.Cl. 39, 46, 411 F.2d 1246, 1249 (1969). The case at hand is no exception.

Plaintiff refers us to *Eyherabide v. United States*, 170 Ct.Cl. 598, 345 F.2d 565 (1965), as an exception to the independent action rule. In *Eyherabide* the property at issue was a ranch surrounded on the east, west, and north by a naval gunnery range. Due to governmental activities on the gunnery range, the owner of the ranch could not hire a caretaker. As a result, vandals apparently destroyed some of the improvements on the ranch.[9] The court allowed a recovery against the United States due to the damage caused by the probable acts of vandals. However, *Eyherabide* is an extreme case and should not be considered a wide–reaching exception to the "independent action" rule. *Eyherabide* is inapposite to our facts; nor do we find the supporting cases cited on this point by plaintiff to be helpful (e. g., *Pete v. United States*, 209 Ct.Cl. 270, 531 F.2d 1018 (1976)). In *Eyherabide* there were repeated physical invasions of the property by the United States in the form of dropped fuel tanks and tow targets, entry of live shells and rockets, destruction of buildings and improvements from gunnery activities, and even actual directions from naval personnel that the then employed caretakers were to leave the premises (because the naval personnel mistakenly believed the property was part of the gunnery range). It was only with relation to these actual and extreme direct physical invasions by the United States that the court was able to grant relief from the damages caused by the supposed vandals. Since the circumstances found to be appropriate to consideration of third–party acts in *Eyherabide* are wholly lacking in this case, we find it inappropriate to hold the United States responsible for the acts of the recreational sailboaters.

Plaintiff also relies on *United States v. Causby*, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946), for the proposition that the Government has "reclaimed for its fee the [p]laintiff's interest in an elevation of twenty–five feet," which act destroyed the plaintiff's use and enjoyment of the air

**9.** Some of the damages complained of were not directly attributable to any single source. It was assumed these were probably acts of vandals.

space above the reservoir. Again, the essential fact which is missing in the instant case is any direct governmental action. The finding of a taking in *Causby* flowed from acts of direct physical invasion of plaintiff's property by United States military aircraft flying outside the navigable air space (i. e., outside the public domain). The Government was held to have taken an avigation easement because the Civil Aeronautics Authority's approved glide path limited the utility of the plaintiff's property. A basis for the finding of the partial taking in *Causby* was the governmental action–an element wholly lacking on our facts. As such, we are not persuaded *Causby* is of any assistance to plaintiff.[10] We have reviewed the remaining authorities relied on by the parties but find it unnecessary to discuss them in view of our disposition of the case on the above–described grounds.

## CONCLUSION

It is concluded there was no taking by the United States. Accordingly, defendant's motion for summary judgment is granted, plaintiff's motion is denied, and the petition is dismissed.

---

**10.** *Griggs v. Allegheny County*, 369 U.S. 84, 82 S.Ct. 531, 7 L.Ed.2d 585 (1962), a case plaintiff referred us to at oral argument (and cited in its brief to the court) is inapposite to our facts as that case involved actual regulations which the respondent was required to adhere to (e. g., rules pertaining to airport approach standards) and which private pilots had to comply with. The result, as in *Causby*, was a finding of a taking by the low overflights.