# United States Court of Appeals for the Federal Circuit

---

**LOVE TERMINAL PARTNERS, L.P., VIRGINIA AEROSPACE, LLC,**
*Plaintiffs-Appellees*

**v.**

**UNITED STATES,**
*Defendant-Appellant*

---

2016-2276

---

Appeal from the United States Court of Federal Claims in No. 1:08-cv-00536-MMS, Judge Margaret M. Sweeney.

---

Decided: May 7, 2018

---

ROGER J. MARZULLA, Marzulla Law, LLC, Washington, DC, argued for plaintiffs-appellees. Also represented by NANCIE GAIL MARZULLA.

ROBERT J. LUNDMAN, Environment and Natural Resources Division, United States Department of Justice, Washington, DC, argued for defendant-appellant. Also represented by JOHN C. CRUDEN.

---

Before PROST, *Chief Judge,* CLEVENGER and DYK, *Circuit Judges.*

DYK, *Circuit Judge.*

Plaintiffs Love Terminal Partners, L.P. ("LTP") and Virginia Aerospace, LLC ("VA") leased a portion of Love Field airport from the City of Dallas, Texas ("Dallas"), and constructed a six-gate airline terminal on the property. Plaintiffs claim that the Wright Amendment Reform Act of 2006 ("WARA"), Pub. L. No. 109-352, 120 Stat. 2011, effected a regulatory taking of their leases and a physical taking of the terminal because, in their view, the statute codified a private agreement in which Dallas agreed (1) to bar use of plaintiffs' gates for commercial air transit and (2) to acquire and demolish plaintiffs' terminal.

The Court of Federal Claims ("Claims Court") agreed and found that the enactment of WARA constituted a per se regulatory taking of plaintiffs' leaseholds under *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003 (1992), and a regulatory taking of the leaseholds under *Penn Central Transportation Co. v. New York City,* 438 U.S. 104 (1978), as well as a physical taking of the terminal itself.

We conclude that WARA did not constitute a regulatory or physical taking. We therefore reverse.

BACKGROUND

This case is about the development of Love Field, an airport located in and owned by Dallas. Since the airport's founding, most air traffic has been accommodated by a main terminal owned and operated by the city. In 2000, plaintiffs constructed a smaller terminal (the "Lemmon Avenue Terminal") on a portion of Love Field that they had leased from the city. This case concerns an alleged taking of the Lemmon Avenue Terminal and plaintiffs' underlying leaseholds.

I

The genesis of the present dispute goes back several decades. In 1955, Dallas entered into a long-term lease with Braniff Airways, Inc. (the "Master Lease"), granting Braniff the exclusive use of a 36-acre portion of Love Field (subsequently reduced to 26.8 acres) located northeast of the two runways, near Lemmon Avenue. The Master Lease guaranteed Braniff non-exclusive access to the runways, taxiways, and other aviation-related facilities at Love Field, and stated that the leased premises must be used for "purposes related or incidental to the primary aviation-related business conducted by Lessee." J.A. 2256.

The use of Love Field for commercial air passenger service has been restricted under federal law since 1980, when Congress passed the Wright Amendment in an effort to promote growth of nearby Dallas/Fort Worth International Airport. The Wright Amendment limited use of Love Field to servicing final destinations within Texas and its four contiguous neighboring states. Pub. L. No. 96-192, § 29, 94 Stat. 35, 48–49 (1980). Its restrictions applied to commercial flights on planes designed to hold over 56 passengers. *Id.* Over the next 25 years, federal legislation was enacted that added four additional states to the list of permissible destinations, and allowed unrestricted flights on larger planes that had been retrofitted to hold fewer than 56 passengers. Pub. L. No. 105-66, § 337, 111 Stat. 1425, 1447 (1997); Pub. L. No. 109-115, § 181, 119 Stat. 2396, 2430 (2005). Nonetheless, commercial air passenger service from Love Field was significantly limited by the Wright Amendment's provisions for most of the airport's modern history.

In 1999, LTP, one the plaintiffs in this case, was assigned an existing sublease for a 9.3-acre portion of the Master Leasehold (the "sublease"). LTP's goal was to offer Wright Amendment-compliant air passenger service out

of Love Field in cooperation with Legend Airlines ("Legend"). LTP would construct a six-gate Lemmon Avenue Terminal and a parking garage on its 9.3-acre parcel, and would license the six gates to Legend.

LTP completed construction of the Lemmon Avenue Terminal by early 2000, and Legend began offering scheduled passenger service from the terminal later that year. The operations were not profitable. After eight months, in December 2000, Legend stopped flying and entered bankruptcy proceedings. Another airline, Atlantic Southeast Airlines, offered scheduled passenger service from the Lemmon Avenue Terminal between July 2000 and May 2001, but ultimately moved its operations to the 26-gate main terminal owned and operated by Dallas. LTP attempted to market its gates to other potential users, but no commercial airline was interested in leasing the gates.

In 2003, plaintiff VA, an entity having common ownership with LTP, invested $6.5 million to acquire the entire 26.8-acre Master Lease. LTP and VA continued their efforts to attract another airline to use the Lemmon Avenue Terminal. They were able to earn some income (though not enough to cover the monthly payments on the Master Lease) through rentals of the parking garage and other portions of their property to an aviation freight company, a limousine company, two automobile dealerships, an aviation reservation service, and several wireless telecommunications companies. But, as before, no airline was willing to lease the gates at the Lemmon Avenue Terminal.

Throughout this period, Southwest Airlines and other airlines offered Wright Amendment-compliant passenger service out of the main terminal. Love Field had been a Southwest hub since the airline's founding, and Southwest had long lobbied Congress to loosen restrictions on

Love Field—ideally by repealing the Wright Amendment. In 2004, Southwest resumed its efforts with a campaign entitled "Wright is Wrong." In 2005, Congress responded by adding Missouri to the list of permitted destinations, but otherwise left the restrictions on Love Field in place.

In March 2006, members of Congress, recognizing "decades of litigation and contentious debate among local communities, airports and airlines over the establishment and development of [Dallas/Fort Worth International Airport], the subsequent use of Love Field, and proposed legislative changes to the Wright Amendment," recommended that Dallas and Fort Worth jointly propose a solution. H.R. Rep. No. 109-600, pt. 1, at 3. On July 11, 2006, Dallas and Fort Worth, along with Southwest Airlines, American Airlines (an airline with a hub at Dallas/Fort Worth International Airport), and the Dallas-Fort Worth Airport Authority, responded by entering into an agreement (the "Five-Party Agreement" or "Agreement") setting out their "local solution."

The Five-Party Agreement stated that the parties would petition Congress for immediate allowance of through-ticketing from Love Field (*i.e.*, permitting airlines to sell tickets from Love Field to any other destination, so long as the flight first stopped at a destination authorized by the Wright Amendment) and for total repeal of the Wright Amendment after eight years. It also stated that the parties would redevelop Love Field consistent with a revised "Love Field Master Plan," which would, among other things, reduce the total number of gates to 20 from the current total of 32 (26 in the main terminal and six in the Lemmon Avenue Terminal), and required that Love Field "thereafter be limited permanently to a maximum of 20 gates." J.A. 3091. The parties also agreed to an allocation of those 20 gates among the three airlines currently flying out of Love Field (all based out of the main terminal). *Id.* And the City of Dallas agreed to acquire and

demolish the Lemmon Avenue Terminal, so as to consolidate the 20 gates in the main terminal, as shown in the revised Master Plan. The Agreement provided that:

> [T]he City agrees that it will acquire all or a portion of the lease on the Lemmon Avenue facility, up to and including condemnation, necessary to fulfill its obligations under this Contract. The City of Dallas further agrees to the demolition of the gates at the Lemmon Avenue facility immediately upon acquisition of the current lease to ensure that that facility can never again be used for passenger service.

J.A. 3092. The Agreement made clear that the costs for the acquisition and demolition of the Lemmon Avenue gates were to be recovered from "airport users." *Id*. Finally, it stated that "[i]f the U.S. Congress does not enact legislation by December 31, 2006, that would allow the Parties to implement the terms and spirit of this Contract, including, but not limited to, the 20 gate restriction at Love Field, then this Contract is null and void unless all parties agree to extend this Contract." J.A. 3095.

In October 2006, Congress enacted WARA, which immediately allowed through-ticketing to and from Love Field and provided for the total repeal of the Wright Amendment in eight years. WARA § 2. WARA also instructed Dallas to reduce the total number of gates available for passenger air service at Love Field to no more than 20. *Id*. § 5(a). It further stated that no federal funds could be used to remove gates at the Lemmon Avenue Terminal. *Id*. § 5(b). The legislation provided that:

> (a) IN GENERAL. – The city of Dallas, Texas, shall reduce as soon as practicable, the number of gates available for passenger air service at Love Field to no more than 20 gates. Thereafter, the number of gates available for such service shall

not exceed a maximum of 20 gates. The city of Dallas . . . shall determine the allocation of leased gates and manage Love Field in accordance with contractual rights and obligations existing as of the effective date of this Act for certificated air carriers providing scheduled passenger service at Love Field on July 11, 2006. To accommodate new entrant air carriers, the city of Dallas shall honor the scarce resource provision of the existing Love Field leases.

(b) REMOVAL OF GATES AT LOVE FIELD. – No Federal funds or passenger facility charges may be used to remove gates at the Lemmon Avenue facility, Love Field, in reducing the number of gates as required under this Act . . . .

*Id.* § 5(a)–(b). Finally, WARA included a provision that prohibited the Secretary of Transportation and the Administrator of the Federal Aviation Administration from taking actions inconsistent with the Five-Party Agreement. *Id.* § 5(d)(1)(A)–(B).

In April 2008, VA stopped paying rent to Dallas on the Master Lease. Dallas instituted eviction proceedings and regained possession of the 26.8 acres of leased property later that year. Between July and September 2009, Dallas demolished the Lemmon Avenue Terminal.

## II

In 2008, LTP and VA filed this suit in the Claims Court, alleging that WARA effected regulatory takings of the Master Lease and the sublease, and a physical taking of the Lemmon Avenue Terminal. On February 11, 2011, the Claims Court held on summary judgment that WARA incorporated the entire Five-Party Agreement into federal law, including the portions reducing the number of gates and committing Dallas to acquire and demolish the Lem-

mon Avenue gates. *Love Terminal Partners v. United States*, 97 Fed. Cl. 355, 424 (2011) ("*Love Terminal Partners I*"). Because the Claims Court concluded that WARA required Dallas to acquire and demolish the gates, it held that WARA effected a physical taking of the Lemmon Avenue Terminal. *Id.* at 424–25.

After fact and expert discovery, a seven-day trial was held to address the remaining issues concerning regulatory takings of the Master Lease and sublease. On April 19, 2016, the Claims Court resolved the regulatory-takings issues by holding that WARA limited plaintiffs' use of their leasehold in such a way as to render it without economic value, creating liability for a taking of plaintiffs' leasehold under both the categorical theory set forth in *Lucas v. South Carolina Coastal*, 505 U.S. 1003 (1992), and a taking under the analysis in *Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978). *Love Terminal Partners v. United States*, 126 Fed. Cl. 389, 424, 430 (2016) ("*Love Terminal Partners II*"). The Claims Court awarded plaintiffs $133.5 million in just compensation for the regulatory and physical takings of their property, plus interest compounded annually starting on the date WARA was enacted into law. *Id.* at 440.

On April 22, 2016, the Claims Court entered judgement in favor of plaintiffs pursuant to Rule 54(b) of the Rules of the Court of Federal Claims. J.A. 161.

The United States appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

DISCUSSION

As a threshold matter, "the existence of a valid property interest is necessary in all takings claims." *Wyatt v. United States*, 271 F.3d 1090, 1097 (Fed. Cir. 2001). Here, it is undisputed that the property interests allegedly taken by WARA are cognizable property interests for

purposes of the Fifth Amendment. After identifying a valid property interest, the court must determine whether the governmental action at issue amounts to a compensable taking of that property interest. *First English Evangelical Lutheran Church of Glendale v. Los Angeles County, California*, 482 U.S. 304, 315 (1987).

This case alleges both physical takings and regulatory takings. A physical taking is the "paradigmatic taking" and occurs by "a direct government appropriation or [a] physical invasion of private property." *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 537 (2005). A regulatory taking occurs "when government actions do not encroach upon or occupy the property yet still affect and limit its use to such an extent that a taking occurs." *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001).

Whether a taking has occurred is a question of law based on factual underpinnings. *Wyatt*, 271 F.3d at 1096. We review the Claims Court's legal conclusions de novo, while reviewing its factual findings for clear error. *Rose Acre Farms, Inc. v. United States*, 559 F.3d 1260, 1266 (Fed. Cir. 2009).

I

We first consider the regulatory-takings issue. The Supreme Court has recognized that a "categorical" regulatory taking occurs in the "extraordinary circumstance" where governmental action deprives a property owner of "all economically beneficial uses" of his property. *Lucas*, 505 U.S. at 1017–18. Outside of this situation—that is, where the property is not rendered totally valueless—the Supreme Court has "generally eschewed any set formula" for identifying the presence of a regulatory taking, "instead preferring to engage in essentially ad hoc, factual inquiries." *Id.* at 1015. In *Penn Central*, the Supreme Court recognized three factors of "particular significance" to this ad hoc analysis: (i) the "economic impact of the

regulation on the claimant," (ii) the "extent to which the regulation has interfered with distinct investment-backed expectations," and (iii) "the character of the governmental action." 438 U.S. at 124.

Plaintiffs' regulatory-takings theory is that they had a right under the leases to use their property for commercial air passenger service. While plaintiffs acknowledge that they had no right to construct or use any particular number of gates, the only way to use the property for commercial air passenger service was to erect gates and lease those gates to airlines.

WARA required Dallas to reduce the total number of gates at Love Field from 32 to 20. Plaintiffs argue that their gates were not among those to be retained. This was so because WARA incorporated portions of the Five-Party Agreement in which the city agreed to demolish plaintiffs' existing gates and to redevelop Love Field "consistent with a revised Love Field Master Plan." *Love Terminal Partners I*, 97 Fed. Cl. at 412; *see also* J.A. 3091; WARA § 5(a). Under the Master Plan, all gates were to be located in the main terminal. J.A. 3091. WARA also directed Dallas to "manage Love Field" and "determine the allocation of leased gates" in accordance with "contractual rights and obligations existing as of the effective date of this Act for certified air carriers." WARA § 5(a). One of these "rights and obligations" was a provision in the Five-Party Agreement that guaranteed Southwest, American, and ExpressJet Airlines the continued use of gates under their existing leases—all of which were located in the main terminal. *Love Terminal Partners I*, 97 Fed. Cl. at 409–11; J.A. 3091. Finally, the Agreement required acquisition and demolition of the Lemmon Avenue Terminal. J.A. 3092.

We assume, without deciding, that plaintiffs' theory as to the effect of the 2006 legislation is correct and that

the legislation effectively barred plaintiffs from using the Lemmon Avenue Terminal for commercial air passenger service. Nevertheless, we conclude that there was no regulatory taking.

Before beginning our regulatory-takings analysis, we must first identify "the precise action that [plaintiff] contends constituted conduct the government could not engage in without paying compensation." *Acceptance Ins. Cos., Inc. v. United States*, 583 F.3d 849, 855 (Fed. Cir. 2009). Here, plaintiffs' regulatory-takings theory rests at the confluence of at least three separate government actions, each of which we must examine separately. *See Branch v. United States*, 69 F.3d 1571, 1575 (Fed. Cir. 1995) (rejecting the plaintiff's characterization of an alleged taking as "too broad" when it involved several distinct government actions and failed to "pinpoint what step in the sequence of events" constituted a taking for which compensation was due).

Notably, plaintiffs have not alleged that enactment of the Wright Amendment itself constituted a taking. To be sure, a takings claim could, in theory, rest on the Wright Amendment's restrictions, which limited the allowable uses of the Master Leasehold when the statute was enacted in 1980. But any Wright Amendment-based claim would have accrued at the time of the statute's enactment and would therefore be barred by the Tucker Act's six-year statute of limitations. *See* 28 U.S.C. § 2501*; see also Fallini v. United States*, 56 F.3d 1378, 1380–82 (Fed. Cir. 1995) (explaining that a taking accomplished by legislation accrues at the time the legislation is enacted); *Whitney Benefits, Inc. v. United States*, 752 F.2d 1554, 1558 (Fed. Cir. 1985) (same). Moreover, it is likely that any such claim would be unavailable to plaintiffs, who acquired their leaseholds in 1999 and 2003 and thus had no valid property interest at the time the Wright Amendment was enacted into law. *See Cienega Gardens v. Unit-*

*ed States*, 331 F.3d 1319, 1328 (Fed. Cir. 2003) (explaining that "the complaining party must show it owned a distinct property interest at the time [the property interest] was allegedly taken, even for regulatory takings"). In any event, plaintiffs do not argue that the enactment of the Wright Amendment constituted a taking.

Instead of relying on enactment of the Wright Amendment, plaintiffs' regulatory takings claim seems to be premised on three distinct government actions and inactions. The first of these is Congress' failure to repeal the Wright Amendment. But it is clear that this kind of government inaction cannot be the basis for takings liability. In *United States v. Sponenbarger*, 308 U.S. 256 (1939), for instance, the Supreme Court found that there was no taking when the government built a flood-protection system but failed to include features that would protect Sponenbarger's property. *Id.* at 265. Similarly, *Georgia Power Co. v. United States*, 633 F.2d 554 (Ct. Cl. 1980), held that there was no taking based on the government's decision not to regulate sailboat heights in a public reservoir. *Id.* at 557. This same principle underlies our recent decision in *St. Bernard Parish Government v. United States*, in which we held that "[o]n a takings theory, the government cannot be liable for failure to act, but only for affirmative acts." No. 16-2301, slip op. at 9 (Fed. Cir. Apr. 20, 2018). The principle that government inaction cannot be a basis for takings liability is equally relevant in the regulatory-takings context. Indeed, every situation in which the Supreme Court has identified a regulatory taking has involved some kind of affirmative government action.[1] And we are aware of no case that has

---

[1]    Early examples of government action resulting in regulatory takings liability include: enactment of a state statute that limited the extent to which coal can be mined

imposed regulatory takings liability based on the government's failure to repeal an existing statute.

Second, Plaintiffs suggest that a taking occurred because WARA provided a benefit to Dallas by liberalizing the Wright Amendment without providing plaintiffs with the same benefit. Here again, plaintiffs' theory rests on government inaction. In any event, takings liability does not arise simply because government action helps some parties but not others. In *Sponenbarger*, for instance, the Supreme Court held that the government did not effect a physical taking when it implemented a flood-control program that only protected certain property owners. 308 U.S. at 265. The same approach governs in the regulato-

---

under homes, *Penn. Coal Co. v. Mahon*, 260 U.S. 393 (1922), and enactment of a federal statute that eliminated certain rights of mortgagees in property held as security, *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555 (1935). More recently, the Supreme Court has found regulatory takings based on an order by the Army Corps of Engineers that the public be allowed access to an exclusive private marina, *Kaiser Aetna v. United States*, 444 U.S. 164 (1979); a federal statute giving the government title to lands that had been set aside for the Sioux Nation in a previous treaty, *United States v. Sioux Nation of Indians*, 448 U.S. 371 (1980); a state statute which appropriated the interest on a court-held interpleader fund, *Webb's Fabulous Pharmacies, Inc., v. Beckwith*, 449 U.S. 155 (1980); a federal statute that required public disclosure of trade secret data, *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986 (1984); a federal statute declaring that small interests in allotted Indian land may not descend by intestacy or devise, but rather must escheat to the tribe, *Hodel v. Irving*, 481 U.S. 704 (1987); and a state statute that barred erection of permanent habitable structures on vacant beachfront lots, *Lucas*, 505 U.S. at 1007.

ry-takings context, where the Supreme Court has noted that "the Takings Clause [is] . . . more than a particularized restatement of the Equal Protection Clause." *Lucas*, 505 U.S. at 1027 n.14; *see also Nollan v. California Coastal Commission*, 483 U.S. 825, 834 n.3 (1987) (distinguishing between takings claims based on regulation of property and equal-protection claims based on regulation of property). Indeed, Plaintiffs concede that "Congress may . . . favor one party over another legislatively." Appellee Br. 54. Congress' failure to extend the benefits of WARA to these plaintiffs is government inaction that cannot support a takings claim.

Finally, plaintiffs argue that WARA constituted a regulatory taking because it prevented use of their property for commercial air passenger service—as had been permitted under the pre-WARA regulatory regime. This is the kind of government action that, in theory, might amount to a regulatory taking, but to establish regulatory-takings liability, a plaintiff must show that a particular government action significantly diminished the value of its property. There cannot be a regulatory taking in the absence of economic injury. *A & D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1157 (Fed. Cir. 2014); *Cienega Gardens*, 331 F.3d at 1340.

Under both the *Penn Central* framework, which looks for the presence of "serious" financial loss, *Cienega Gardens*, 331 F.3d at 1340, and the *Lucas* framework, which asks whether the property has been left without any "economically beneficial use", 505 U.S. at 1017–19, there is no regulatory taking unless the government action has caused a decline in the value of the property. Importantly, both the *Penn Central* and *Lucas* frameworks require the economic injury to be caused by the government action at issue, not by some other factor. *A & D Auto Sales*, 748 F.3d at 1157. To assess the severity of a regulation's economic impact, the court must compare the value of the

property immediately before the governmental action that is alleged to cause the taking with the value of the same property immediately after that governmental action. *Id.*; *see also Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 496–97 (1987); *Forest Properties, Inc. v. United States*, 177 F.3d 1360, 1367 (Fed. Cir. 1999). This economic impact inquiry relates not to the amount of compensation, but to whether a taking has occurred at all.

Proving economic loss requires a plaintiff to "show what use or value its property would have but for the government action." *A & D Auto Sales*, 748 F.3d at 1157. Thus, a showing that property is valueless *after* a government action only suggests that a taking has occurred if there is evidence showing that the property would have had value *absent* the government action. This was the issue in *A & D Auto Sales*, where we found that General Motors Corporation and Chrysler LLC dealers had failed to state a regulatory-takings claim based on the impact of a federal program that aimed to keep failing automakers afloat using government funds. The program offered federal assistance to automakers on the condition that they took certain steps to improve financial viability, including termination of plaintiffs' franchise agreements. We held that the dealers failed to state a regulatory-takings claim because they did not allege that their franchises would have had value if the government had not intervened at all. "Absent an allegation that GM and Chrysler would have avoided bankruptcy but for the government's intervention and that the franchises would have had value in that scenario, or that such bankruptcies would have preserved some value for the plaintiffs' franchises," we explained, "the terminations actually had no net negative economic impact on the plaintiffs because their franchises would have lost all value regardless of the government action." *Id.* at 1158.

Here there can be no regulatory taking because plaintiffs have not demonstrated, or even attempted to demonstrate, that their ability to use their property for commercial air passenger service under the pre-WARA regulatory regime had any value.

The Claims Court's determination that WARA destroyed all economically beneficial use and value of plaintiffs' property was entirely based on testimony from plaintiffs' experts that the property had value, not under the regulatory regime that existed before WARA, but under a regime in which the Wright Amendment was repealed or modified.[2] *Love Terminal Partners II,* 126 Fed. Cl. at 415, 425, 433. None of plaintiffs' experts assessed the use or value of plaintiffs' leaseholds with the Wright Amendment in effect—despite the fact that the Wright Amendment was the governing law at the time of the alleged taking and had been for over a quarter century before then.

---

[2]    Mr. Robert Massey, whose testimony the Claims Court relied on in its economic impact analysis, assessed the property's pre-WARA value based on the assumption that Congress was expected to repeal the Wright Amendment after eight years without restricting plaintiffs' ability to use their property for air passenger service. *Love Terminal Partners II,* 126 Fed. Cl. at 415 n.20. Plaintiffs' other experts, whose opinions informed the Claims Court's just compensation decision, calculated the pre-WARA value of plaintiffs' property based on an even more aggressive version of Mr. Massey's assumption: that the Wright Amendment would be totally and immediately repealed on October 13, 2006, thereby allowing plaintiffs to construct a 16-gate terminal that could offer nationwide flights on large planes by mid-2008. *Id.* at 433, 437.

In summary, plaintiffs must show that their property had value in the regulatory environment that existed before the government action, and that this value was diminished by the government action that prevented them from operating under the existing regime. They presented no such testimony. Nor is there any indication that they could have done so. Plaintiffs' historical financial performance suggests that their property was *not* valuable for air passenger service with the Wright Amendment in place. Legend, the tenant for which the Lemmon Avenue Terminal was designed, went bankrupt in December 2000, eight months after beginning operations. Atlantic Southeast Airlines, the terminal's only other airline tenant, moved its operations to Love Field's main terminal a few months later. Plaintiffs tried to market their property to other airlines, but never received an actual offer, so by the time of WARA's enactment no airline had used the Lemmon Avenue Terminal or paid any rent to plaintiffs for more than five years. Indeed, between their acquisition of the sublease in 1999 and the enactment of WARA in 2006, plaintiffs suffered a net income loss of roughly $13 million. And at no point during that time, including during the period when Legend was operational, did revenue exceed plaintiffs' carrying costs so as to meet plaintiffs' expert's definition for an "economically beneficial use." Since there was no adverse economic impact, there can be no taking.

Instead of analyzing the government's actions and inactions individually, as we have done above, the Claims Court conflated the three, treating them as a single government action. But even under that approach, plaintiffs have failed to demonstrate a taking.

In its *Penn Central* analysis, the Claims Court found that plaintiffs, at the time they acquired the leases in 1999 and 2003, had a reasonable, investment-backed expectation in the outright repeal of the Wright Amend-

ment.[3] *Love Terminal Partners II,* 126 Fed. Cl. at 428–29. As a factual matter, we question the Claims Court's finding that plaintiffs had such an expectation at the time they acquired the leases,[4] and we also question the Claims Court's determination that an expectation of complete Wright Amendment repeal would have been reasonable.[5] But in any event, the Claims Court's approach is unsound.

---

[3]      Plaintiffs' reasonable investment-backed expectations are judged as of the time they acquired the leases. *Cienega Gardens v. United States*, 503 F.3d 1266, 1288 (Fed. Cir. 2007) ("[T]he burden is on the [plaintiff] to establish a reasonable investment-backed expectation in the property at the time it made the investment."); *Appolo Fuels, Inc. v. United States*, 381 F.3d 1338, 1349 (Fed. Cir. 2004).

[4]      Indeed, plaintiffs' business plan, which was sent to investors, indicated that they specifically intended to operate within—and even take advantage of—the Wright Amendment's plane size and destination restrictions. An accompanying memorandum, which the leader of plaintiffs' due diligence team testified to be "a very good summary of all the things that we considered . . . both the risks and the positives", J.A. 396, affirmatively characterized Love Field's "complex legal and regulatory status" as an asset because it would "significantly limit competition for the real estate . . . and the airline," J.A. 2649.

[5]      Any expectation of Wright Amendment repeal in 1999 or 2003 was speculative. The Wright Amendment had been in effect for two decades and, during that time, the only legislative movement towards total repeal was a bill, first introduced by Congressman Dan Glickman of Kansas in 1989 and reintroduced in 1991, on which no action was ever taken. *See Love Terminal Partners II,* 126 Fed. Cl. at 426 n.34. Plaintiffs also point to a 1992 De-

The reasonable, investment-backed expectation analysis is designed to account for property owners' expectation that the regulatory regime in existence at the time of their acquisition will remain in place, and that new, more restrictive legislation or regulations will not be adopted. As we said in *Cienega Gardens*, "[t]he purpose of consideration of plaintiffs' investment-backed expectations is to limit recoveries to property owners who can demonstrate that 'they bought their property in reliance on a state of affairs that did not include the challenged regulatory regime.'" 331 F.3d at 1346.

This expectations analysis is not designed to protect private predictions of regulatory change. To the contrary, what is "relevant and important in judging reasonable expectations" is "the regulatory environment at the time of the acquisition of the property." *Commonwealth Edison Co. v. United States*, 271 F.3d 1327, 1350 n.22 (Fed. Cir. 2001) (en banc). Neither the Claims Court nor the plaintiffs have cited any cases that find a reasonable, investment-backed expectation in any beneficial future regulatory change, and the Supreme Court has rejected the theory that there can be reasonable, investment-

---

partment of Transportation study, which found that repeal of the Wright Amendment would benefit consumers without harming Dallas/Fort Worth International Airport. But this study came seven years before plaintiffs' investment and in no way suggested that repeal was imminent. The only regulatory movement in the intervening period was the Shelby Amendment, which relaxed the Wright Amendment's restrictions but fell far short of the kind of deregulation that would allow plaintiffs to operate a terminal with nationwide flights on large planes. And concrete proposals to modify the Wright Amendment did not become significant until 2004, after plaintiffs had acquired the property.

backed expectations in the absence of a current regulatory regime. In *Ruckelshaus*, for instance, the Supreme Court concluded that plaintiffs only had a reasonable expectation in the confidentiality of trade secrets disclosed to the EPA in pesticide registration applications to the extent that the relevant statute explicitly guaranteed confidentiality at the time of submission. 467 U.S. at 1005–06. The Court explained that plaintiffs could not have had a reasonable expectation of trade secret confidentiality prior to 1972, when the statute was silent as to how the EPA could use and disclose data, or after 1978, when the statute explicitly allowed disclosure of all data after ten years. *Id.* at 1006–10. Only between the 1972 and 1978 amendments did the statute "explicitly guarantee[] . . . an extensive measure of confidentiality" for any data designated as a trade secret at the time of submission, and only during that period could the plaintiffs have reasonable expectations of confidentiality. *Id.* at 1011.

LTP and VA's reasonable, investment-backed expectations are similarly limited by the regulatory regime in place at the time they acquired the leases, which included the Wright Amendment. The failure to establish "reasonable, investment-backed expectations," at least under the *Penn Central* analysis, "defeats [a regulatory] takings claim as a matter of law." *Good v. United States*, 189 F.3d 1355, 1363 (Fed. Cir. 1999); *see also Ruckelshaus*, 467 U.S. at 1005.[6]

---

[6]    We note that there appears to be conflict between circuits as to whether reasonable, investment-backed expectations are relevant to the *Lucas* analysis. *Compare Palm Beach Isles Assocs. v. United States*, 231 F.3d 1354, 1364 (Fed. Cir. 2000) (holding that, if a land use restriction amounts to a categorical taking under *Lucas*, the property owner is entitled to a recovery "without regard to

On appeal, plaintiffs largely abandon the Claims Court's theory of reasonable investment-backed expectations, and argue instead that, under *Lucas*, a showing of reasonable, investment-backed expectations is not required, and that, under *Penn Central*, a mere expectation that they could use the property for air passenger service is sufficient. Plaintiffs' problem, as described above, is that, under both the *Penn Central* and *Lucas* analyses, a showing of economic harm is essential. Plaintiffs argue that anticipated legal changes should be taken into account in valuing the property, citing a number of condemnation cases which suggest that "reasonably probable" zoning changes can be considered when assessing a property's fair market value if the landowner can demonstrate that "just prior to the time of taking, a knowledgeable buyer would have taken into account the reasonable probability that the land in question would be rezoned." *H & R Corp. v. District of Columbia*, 351 F.2d 740, 742 (D.C. Cir. 1965); *see also Bd. of Cty. Supervisors of Prince William Cty., VA v. United States*, 276 F.3d 1359, 1365–66 (Fed. Cir. 2002); *United States v. 480.00 Acres of Land*, 557 F.3d 1297, 1300, 1313 (11th Cir. 2009); *United States v. 320.0 Acres of Land, More or Less in Monroe Cty., State of Fla.*, 605 F.2d 762, 818 (5th Cir. 1979); *Gov't of Virgin Islands v. 2.7420 Acres of Land*, 411 F.2d 785, 786 (3d Cir. 1969).

---

the nature of the owner's initial investment-backed expectations."), *with Reahard v. Lee County*, 968 F.2d 1131, 1136 (11th Cir. 1992) (holding that "to resolve the question of whether the landowner has been denied all or substantially all economically viable use of his property, the factfinder must analyze, at the very least: (1) the economic impact of the regulation on the claimant; and (2) the extent to which the regulation has interfered with investment-backed expectations.").

It is undoubtedly true that, when assessing the economic impact of a particular government action alleged to constitute a taking, a court can consider the extent to which other, unrelated, reasonably probable zoning or regulatory changes may have influenced the property's fair market value. But this principle does not remotely authorize the economic impact analysis undertaken here by the Claims Court. To the contrary, the cases plaintiffs cite in support of their valuation theory emphasize that plaintiffs cannot seek compensation for economic value attributable to the project for which the property was taken.

This principle, known as the "scope of the project" rule, was announced in *United States v. Miller*, 317 U.S. 369, 370 (1943), a case involving a federal reservoir project that flooded an existing railroad right-of-way, thereby making it necessary for the government to acquire additional land to relocate the railroad tracks. In implementing the reservoir project, the government designated Miller's property for condemnation for track relocation. But before Miller's property was condemned, the reservoir project itself prompted development in the area, making Miller's property more valuable. *Id.* at 371. Miller argued that he was entitled to the fair market value of his land—including the increase in value attributable to the reservoir project. The government argued that just compensation should not include any enhanced value attributable to the federal project for which the land was taken, and the Supreme Court agreed. *Id.* at 376–77; *see also 480.00 Acres of Land*, 557 F.3d at 1307 ("[W]hen deciding the market value of [a] property the fact-finding body does not consider the positive or the negative impact of any decision the Government makes within the scope of the project which prompted the taking."); *320.0 Acres of Land*, 605 F.2d at 784; 3-8A *Nichols on Eminent Domain* § 8A.01 (rev. 3d ed. 2006).

We have also found that the *Miller* rule applies to the question of whether property has been taken in the first place. *John B. Hardwicke Co. v. United States*, 467 F.2d 488, 490–91 (Ct. Cl. 1972) (finding that "plaintiffs cannot base a taking claim on the hypothesis that they can garner the benefit conferred by [one part of the Rio Grande water-control program], without deduction for the probable detriment when [another part of the Rio Grande water-control program] comes into being too").

Here, the government action that allegedly effected a taking, WARA, is the same action that liberalized the Wright Amendment. Plaintiffs, like Miller, argue that they deserve compensation because WARA's deregulatory aspects would have made their property more valuable—if only it had not restricted use of the property for commercial air passenger service. The Supreme Court rejected this reasoning in *Miller*, explaining that "owners were not entitled, if [their lands] were ultimately taken, to an increment of value calculated on the theory that if they had not been taken they would have been more valuable." 317 U.S. at 379.

In short, the plaintiffs have not shown a decrease in the value of their property as a result of government regulation. Even assuming that WARA barred the use of plaintiffs' property for air passenger service, there is still no regulatory taking under the *Penn Central* or *Lucas* analyses because plaintiffs failed to demonstrate that their property would have had value (with the Wright Amendment in effect) that was adversely affected by government action. As the Supreme Court said in *Brown v. Legal Foundation of Washington*, "just compensation for a net loss of zero is zero." 538 U.S. 216, 240 n.11 (2003); *see also A & D Auto Sales,* 748 F.3d at 1157; *Cienega Gardens*, 331 F.3d at 1340.

II

The Claims Court also held that WARA effected a physical taking of plaintiffs' terminal because, by incorporating the entire Five-Party Agreement, it required Dallas to demolish plaintiffs' gates. *Love Terminal Partners I*, 97 Fed. Cl. at 424. It is well established that the government may incur takings liability based on the actions of a third party when that third party is acting pursuant to a federal mandate—as plaintiffs allege Dallas was here. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 421 (1982); *Preseault v. United States*, 100 F.3d 1525, 1551 (Fed. Cir. 1996); *see also A & D Auto Sales,* 748 F.3d at 1153–56. We find, however, that WARA did not codify the Five-Party Agreement in its entirety and specifically did not codify the portions of the Agreement in which Dallas agreed to acquire and demolish plaintiffs' gates.

The Claims Court's determination that WARA incorporated the entire Five-Party Agreement was based largely on the fact that the statute mirrors many of the Agreement's key provisions, and on the fact that WARA's language "borrows from or is virtually identical to language" in the Agreement itself.[7] *Love Terminal Partners I*,

---

[7] In further support of the incorporation theory, both Plaintiffs and the Claims Court point to cases brought in other jurisdictions on antitrust and state-law claims. *City of Dallas v. Delta Air Lines Inc.*, 847 F.3d 279, 282 (5th Cir. 2017); *Love Terminal Partners v. City of Dallas*, 256 S.W.3d 893, 896 (Tex. App. 2008); *Love Terminal Partners, L.P. v. City of Dallas*, 527 F. Supp. 2d 538, 547, 560 (N.D. Tex. 2007). Most of these cases concluded that WARA incorporated only some of the Five-Party Agreement. And, in any event, they are not controlling here.

97 Fed. Cl. at 404. The Claims Court pointed out, for instance, that § 5(d)(1) of WARA explicitly referenced the Five-Party Agreement. That section provides that the Secretary of Transportation and the Administrator of the Federal Aviation Administration may not take actions "inconsistent with the contract dated July 11, 2006 entered into by the city of Dallas, the city of Fort Worth, the DFW International Airport Board, and others regarding the resolution of the Wright Amendment issues" or "that challenge the legality of any provision of such contract." The Claims Court determined that "the explicit references to the Contract in the language of the statute demonstrate Congress's intent to incorporate the Contract into [] WARA." *Love Terminal Partners I*, 97 Fed. Cl. at 406.

It is true that WARA incorporates portions of the Agreement, makes a number of specific changes to federal law contemplated in the Agreement, and directly references the Agreement. But we think that the Claims Court misread the statute. WARA does not incorporate Dallas' commitment to "demoli[sh] the gates at the Lemmon Avenue facility immediately upon acquisition of the current lease to ensure that the facility can never again be used for passenger service." J.A. 3092. Indeed, the requirement that federal funds not be used for removal of Lemmon Avenue gates explicitly distances the federal government from Dallas' intended action.

Even if WARA had codified the portion of the Five-Party Agreement in which Dallas agreed to "acquire all or a portion of the lease on the Lemmon Avenue facility, up to and including condemnation" and to then "demoli[sh] the gates at the Lemmon Avenue facility immediately upon acquisition of the current lease," *id.*, it still would not constitute a physical taking. Incorporation of these provisions, at most, required Dallas to negotiate with plaintiffs and then, if negotiation proved unsuccessful, bring a condemnation proceeding pursuant to which

plaintiffs would receive just compensation. *See* Tex. Prop. Code § 21.0113 (requiring the government to negotiate before filing a condemnation suit).

Acquisition of plaintiffs' property through negotiation could not constitute a taking because any property transfer would be voluntary. A physical taking only occurs where the government "*requires* the landowner to submit to the physical occupation of his land." *Yee v. City of Escondido,* 503 U.S. 519, 527 (1992); *FCC v. Florida Power Corp.*, 480 U.S. 245, 252 (1987) ("This element of required acquiescence is at the heart of the concept of occupation.").

So too, the requirement that Dallas acquire plaintiffs' property through the exercise of eminent domain would not be a taking by the United States. Plaintiffs could have chosen to retain their leases, thereby compelling Dallas to take the property through a condemnation proceeding. It is axiomatic that property is not taken without just compensation in violation of the Fifth Amendment when the act that allegedly effects a taking incorporates a provision to receive just compensation. *Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 194–95 (1985) ("If the government has provided an adequate process for obtaining compensation, and if resort to that process 'yield[s] just compensation,' then the property owner 'has no claim against the Government' for a taking."). Because WARA, at most, directs Dallas to acquire plaintiffs' gates through negotiation or eminent domain, it could not constitute a taking without just compensation.

Ultimately, of course, Dallas gained possession of plaintiffs' leasehold through an eviction proceeding, which was brought after plaintiffs stopped paying rent. This is a course of action that Dallas was entitled to pursue as a

lessor and for which no just compensation is due, even if directed by the United States.

## CONCLUSION

We find that there was no regulatory taking under either *Penn Central*'s three-factor analysis or the categorical approach described in *Lucas*. There was no physical taking because WARA did not "codify" the relevant portions of the Five-Party Agreement or otherwise require destruction of the Lemmon Avenue gates without compensation. We therefore reverse.

**REVERSED**